UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ANDRE SOARES DE SOUZA,<br>    Petitioner,<br><br>    v.<br><br>MICHAEL NESSINGER;<br>DAVID WESLING;<br>TODD M. LYONS;<br>MARKWAYNE MULLIN,<br>    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     No. 26-cv-221-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief Judge United States District Court.

Andre Soares De Souza is currently in the custody of Immigration and Customs Enforcement ("ICE") at the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island (the "Wyatt"). ECF No. 1. Mr. De Souza has filed a habeas petition under 28 U.S.C. § 2241, seeking immediate release from ICE detention. *Id.* at 10. He asserts that the Immigration Judge ("IJ") who conducted his bond hearing "improperly denied bond by relying exclusively on allegations of criminal offenses contained in [ICE] arrest records for a case that was dismissed." *Id.* at 1. The Government objects to Mr. De Souza's petition and contends that the IJ properly denied bond. ECF No. 5 at 2-3.

For the reasons stated below, the Court agrees with the Government. As such, the Court DENIES Mr. De Souza's petition.

## I.    BACKGROUND

Mr. De Souza is a native and citizen of Brazil.  ECF No. 1 at 3.  In or around October 2017, he entered the United States on a B-2 visitor visa.[1]  *Id.* at 4; ECF No. 5 at 3.  He remained in the country after his visa expired and subsequently moved to Massachusetts.  ECF No. 1 at 3.

On the night of February 25, 2026, two Lowell, Massachusetts police officers responded to a 911 call made by Mr. De Souza.  ECF No. 1-3 at 3; ECF No. 6-4 at 2. He and his girlfriend[2] had gotten into a dispute in their home, and Mr. De Souza reportedly called the police to de-escalate the situation.  ECF No. 6-4 at 2.

Upon arriving at the couple's home, Mr. De Souza's girlfriend provided a statement to the officers in which she explained that Mr. De Souza was intoxicated and that the two of them had been arguing about his drinking, as well as other relationship issues.  ECF No. 1-3 at 3-4.  She further described Mr. De Souza's behavior as "violent and argumentative," detailed how he consumed alcohol almost every single day, and stated that he tends to "strike the walls, doors or other inanimate objects" during drunken stupors.  *Id.* at 4-5.

She also told the officers that a few months earlier, on December 24, 2025, Mr. De Souza engaged in an argument with her while intoxicated and forcefully grabbed

---

[1] "A 'B-2 visa' is available, for example, to 'tourists and those coming for social visits, health reasons, or participation in amateur music and sports events.'" *Adeyanju v. Garland*, 27 F.4th 25, 31 n.1 (1st Cir. 2022) (quoting 1 Charles Gordon et al., Immigration Law and Procedure § 1.03 (2021)).

[2] To protect her privacy, the Court will not refer to Mr. De Souza's girlfriend by name.

an AirPod out of her left ear, which caused the piercing in her ear to bleed. *Id.* at 5. When asked why she had not reported the incident sooner, Mr. De Souza's girlfriend responded that she was and still fears Mr. De Souza and said that it was "shameful to report such matters." *Id.*

At the scene, the officers conducted a Lethality Assessment Protocol ("LAP") reading[3] with Mr. De Souza's girlfriend. *Id.* at 3. When asked whether Mr. Souza was "violent, extremely jealous or controlling" and whether he "follow[ed] or sp[ied] on [her] or [left] threatening messages," she answered "Yes" to both questions. *Id.*

One of the officers then asked to speak with Mr. De Souza, who only speaks Portuguese. *Id.* at 5. The officer asked Mr. De Souza's girlfriend's son—who also happened to be present at the scene—to translate from Portuguese to English. *Id.* Mr. De Souza confirmed that he argued with his girlfriend on December 24, 2025, but stated that the dispute was verbal in nature. *Id.*

At this point, the officers placed Mr. De Souza under arrest and charged him with domestic assault and battery. *Id.* The next day, Mr. De Souza was arraigned in Lowell District Court, and he was later released on his own recognizance. ECF No. 1 at 4; *see also* ECF No. 10 at 3. However, ICE officers arrested Mr. De Souza at the

---

[3] LAP is a risk assessment tool used by law enforcement officers who respond to calls of domestic violence. *See* Mass. Exec. Off. of Pub. Safety and Sec., Recommended Best Practices for Domestic Violence High Risk Teams in Massachusetts 6 (Dec. 2019), https://www.mass.gov/doc/recommended-best-practices-for-domestic-violence-high-risk-teams-in-massachusetts/download [ ]. As part of LAP, officers generally ask a series of questions meant to evaluate the level of risk posed by an alleged perpetrator of domestic violence. *Id.*

3

courthouse and charged him with being removable under 8 U.S.C. § 1227(a)(1)(B).[4] *See* ECF No. 6-1 at 8-9.  He was later placed in immigration detention at the Wyatt. *Id.* at 9.

While in detention, Mr. De Souza requested a bond hearing.  ECF No. 1 at 4. An IJ denied Mr. De Souza's request for release on bond.  ECF No. 5 at 1; ECF No. 9 at 3.  Mr. De Souza later requested a second bond hearing, which was held on April 7, 2026.  ECF No. 5 at 4.

Before the hearing, the attorney representing the Department of Homeland Security ("DHS") submitted the police report and Lowell District Court docket detailing Mr. De Souza's arrest, as well as a Form I-213.[5]  ECF No. 6-1 at 4-18.  For his part, Mr. De Souza, through his attorney, submitted about 150 pages of evidence in support of his request for release on bond.  *Id.* at 22-172.  Included in this evidence was a letter from Mr. De Souza's girlfriend,  in which she stated that: "[Mr. De Souza] did not physically harm [her]"; "[she] did not sustain any injuries"; and "[a]t no point did [she] feel that [she] was in danger."  ECF No. 6-4 at 2.  She also stated that: "[she] do[es] not consider [herself] a victim of domestic violence"; "[she] do[es] not fear [Mr.

---

[4] This provision of the Immigration and Nationality Act ("INA") renders a noncitizen removable if they overstay their visa. *See Rosa v. Garland*, 114 F.4th 1, 5 (1st Cir. 2024).

[5] A Form I-213 is essentially a police report created by a DHS officer, which lists biographical and factual information about the noncitizen. *See España v. Nessinger*, No. 26-cv-014-JJM-PAS, 2026 WL 821788, at *11 (D.R.I. Mar. 25, 2026) (citing *Garcia-Aguilar v. Lynch*, 806 F.3d 671, 673 (1st Cir. 2015); *Jianli Chen v. Holder*, 703 F.3d 17, 23 n.4 (1st Cir. 2012)).  The form "may refer to criminal charges that a noncitizen is alleged to have committed, but it is not evidence of those criminal charges themselves." *Id.*

De Souza]"; and that "[she] do[es] not believe [Mr. De Souza] poses any risk to [her]

or to the community." *Id.* at 3.

At the second bond hearing, the IJ determined that Mr. De Souza posed a

danger to the community, and she stated as follows:

> **IJ:**    Court's reviewed the evidence in the record in its entirety and has
> considered the arguments.  The Court does find that [Mr. De Souza] has
> been shown to be a danger to the community by clear and convincing
> evidence.  Court understands the arguments of counsel, however, there
> is a police report in the file, and at the time, the alleged victim of the
> pending assault charge, or the alleged victim of the domestic violence
> incident resulting in [Mr. De Souza's] arrest indicates, as court noted,
> that the victim or, I'll refer to her as the alleged victim, was forcibly
> grabbed by [Mr. De Souza], that he grabbed her left ear, tearing
> the AirPod out of her ear and causing the piercing in her ear to bleed.
> She also stated that [Mr. De Souza] would strike the walls, doors, or
> other inanimate objects during effectively drunk stupors, and that he
> has an ongoing and serious issue with alcohol.  She's tried to get
> help for his alcoholism, but her attempts have failed.  She described
> his behavior as violent and argumentative, and she stated to the police
> during her encounter, that she was, and still is, scared of [Mr. De Souza],
> and that it is shameful to report such matters.  So, the court is giving
> more weight to the statements of the alleged victim during the
> contemporaneous interview with the officers than a, essentially
> a recantation letter much, much after the fact, when she would likely
> have more time to consider these things.  And the court is giving more
> weight to the statement she made at the time, and around the time of
> the incident, as it was made in real time.  And the court notes that the
> victims of domestic violence often recant their statements.  Court will
> also note that there is corroboration within the police report given the
> statements of the alleged victim herself, that in itself is corroboration of
> the police report and the violence to the victim.  This is recent, this is
> still pending.  Court has considered positive equites in the record,
> including letters of support and other positive evidence submitted by
> [Mr. De Souza].  Nevertheless, given the very serious nature of the
> incident, as well as the statements of the alleged victim herself to the
> police of an ongoing concern for her safety and ongoing violence and
> aggression and drinking issues of [Mr. De Souza], court does find the
> respondent a danger to the community by clear and convincing evidence.
> Court's denying bond.

Bond Hearing, at 13:02-16:09, Chelmsford Immigr. Ct. (recorded Apr. 7, 2026) (hereinafter "Bond Hearing").[6]  As such, the IJ denied Mr. De Souza's request for release on bond.  ECF No. 3 at 1 (displaying the IJ's bond determination).

Mr. De Souza filed the present habeas petition a few weeks later.  ECF No. 1. He primarily argues that his second bond hearing was constitutionally deficient because the evidence that the IJ considered "could not, as a matter of law, have supported the IJ's decision to deny bond."  ECF No. 9 at 10.  The Government objects to Mr. De Souza's petition, asserting, among other things, that his second bond hearing was constitutionally sound.  ECF No. 5.

## II.   DISCUSSION

### A.   Jurisdiction

#### 1.   Section 1226(e)

At the outset, the Government presents a familiar argument, asserting that 8 U.S.C. § 1226(e) deprives this Court of jurisdiction to review Mr. De Souza's habeas petition.  ECF No. 5 at 8-9.  This provision of the INA provides that "[t]he [Secretary of Homeland Security's][7] discretionary judgment regarding the application of this

---

[6] The Government submitted an audio recording of the bond hearing.  *See* ECF No. 6-2.  The Court has listened to the bond hearing in its entirety and quotes relevant portions of it throughout this Order.

[7] The language of the statute refers to the "Attorney General's discretionary judgment."  8 U.S.C. § 1226(e).  However, following the lead of the Supreme Court, the Court has replaced the Attorney General with the Secretary of Homeland Security because "Congress has empowered the Secretary to enforce the Immigration and Nationality Act."  *Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (citing 8 U.S.C. § 1101 *et seq.*); *see also id.* at 401 (replacing "Attorney General" with "Secretary" for the purposes of Section 1226(e)).

section shall not be subject to review," and that "[n]o court may set aside any action or decision by the [Secretary] under this section regarding the detention of any [noncitizen] or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). As it has in previous cases, the Government insists that Section 1226(e) precludes the Court from reviewing the IJ's decision to detain Mr. De Souza without bond. ECF No. 5 at 9. It does not.

As the Court has stated many times before, Section 1226(e) does not deprive it of jurisdiction over "constitutional claims or questions of law." *See, e.g.*, *Garcia v. Hyde*, 817 F. Supp. 3d 112, 124 (D.R.I. 2025); *Mavungo-Raymond v. Nessinger*, No. 26-cv-013-JJM-AEM, 2026 WL 161358, at *8 (D.R.I. Jan. 21, 2026); *Picado v. Hyde*, No. 26-cv-065-JJM-PAS, 2026 WL 352691, at *4-5 (D.R.I. Feb. 9, 2026); *España v. Nessinger*, No. 26-cv-014-JJM-PAS, 2026 WL 821788, at *4-6 (D.R.I. Mar. 25, 2026); *Higiro v. Nessinger*, No. 26-cv-105-JJM-AEM, 2026 WL 1329522, at *2 n.4 (D.R.I. May 13, 2026).

Indeed, "where a 'bond denial is challenged as legally erroneous or unconstitutional,' a district court sitting in habeas retains jurisdiction over that challenge." *España*, 2026 WL 821788, at *5 (quoting *Mayancela Mayancela v. FCI Berlin, Warden*, No. 25-cv-348-LM-TSM, 2025 WL 3215638, at *6 (D.N.H. Nov. 18, 2025)). That is precisely the challenge Mr. De Souza lodges here, arguing that the IJ who conducted his bond hearing violated his due process rights in denying his request for release from detention. ECF No. 1 at 9-10. Thus, the Court reaffirms that it has jurisdiction over cases like Mr. Souza's "to ensure that immigration bond hearings

are conducted within constitutional bounds." *Miti v. Moniz*, No. 26-11327-BEM, ---
F. Supp. 3d ----, 2026 WL 884639, at *1 (D. Mass. Mar. 31, 2026); *see also Garcia*, 817
F. Supp. 3d at 124.

### 2.    Section 1252(a)(2)(B)(ii)

The Government also argues that 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial
review over Mr. De Souza's claim.  ECF No. 5 at 9-11.  That provision of the INA
states that "no court shall have jurisdiction to review . . . any other decision or action
of the Attorney General or the Secretary of Homeland Security the authority for
which is specified under [8 U.S.C. §§ 1151-1378] to be in the discretion of the Attorney
General or the Secretary of Homeland Security . . . ."  8 U.S.C. § 1252(a)(2)(B)(ii).

As numerous courts have recognized, Section 1252(a)(2)(B)(ii), like Section
1226(e), "'does not limit habeas jurisdiction over questions of law'" or "constitutional
claims." *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (quoting *Singh v.
Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)); *see also Hernandez v. Mullin*, No. 5:26-
CV-00585-JAK, 2026 WL 846037, at *4 (C.D. Cal. Mar. 24, 2026) (collecting cases).
Again, Mr. De Souza argues that the bond hearing he was provided failed to comport
with the standard that due process requires, and Section 1252(a)(2)(B)(ii) does not
preclude the Court from reviewing that argument.

B.    The Merits[8]

Turning to the merits of the case, the question the Court must answer is whether the evidence that the Government presented to the IJ was sufficient to deny Mr. De Souza's request for release on bond.  To detain a noncitizen under Section 1226(a), the Government has the burden of proving either by: (1) clear and convincing evidence that the noncitizen poses a danger to the community; or (2) preponderance of the evidence that the noncitizen poses a flight risk.  *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021).

Where a noncitizen challenges an IJ's bond determination, "to obtain habeas relief, the noncitizen must show that the IJ 'failed to place the burden of proof on the Government' to either show dangerousness by clear and convincing evidence or flight risk by a preponderance of the evidence." *Picado*, 2026 WL 352691, at *6 (quoting *Mayancela Mayancela*, 2025 WL 3215638, at *5).  This showing can be made in one of two ways: "(1) demonstrating that the IJ erred because the evidence itself could not, as a matter of law, have supported the IJ's decision to deny bond; or (2) pointing to the IJ's opinion itself and showing that the IJ failed to apply the correct standard to the facts." *Id.* (citing *Garcia v. Hyde*, 817 F. Supp. 3d 112, 126 (D.R.I. 2025)).

Mr. De Souza proceeds on the second track, challenging the IJ's determination that he poses a danger to the community and arguing that "the evidence itself could not, as a matter of law, have supported the IJ's decision to deny bond."  ECF No. 9

---

[8] The Government also raises exhaustion arguments, *see* ECF No. 5 at 17-24, that the Court need not reach because it sides with the Government on the merits.

at 10.   To determine whether a noncitizen poses a danger to the community, the Board of Immigration Appeals ("BIA") instructs IJs to weigh nine factors.  *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006), *abrogated on other grounds, Hernandez-Lara*, 10 F.4th at 41.[9]  The IJ "may" consider "any or all of the following": (1) whether the noncitizen has a fixed address in the United States; (2) the noncitizen's length of residence in the United States; (3) the noncitizen's family ties in the United States, particularly those which could confer immigration benefits on the noncitizen; (4) the noncitizen's employment history; (5) the noncitizen's record of appearance in court; (6) the noncitizen's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the noncitizen's history of immigration violations; (8) any previous attempts to escape from authorities or avoid prosecution; and (9) the noncitizen's manner of entry to the United States. *See id.*

Here, the IJ found Mr. De Souza to pose a danger to the community by clear and convincing evidence based on his arrest for domestic assault and battery.  *See* Bond Hearing, at 15:47-16:09.  As support for this finding, the IJ gave considerable weight to the police report detailing Mr. De Souza's arrest, as well as the statement

---

[9] "The First Circuit has since abrogated *Matter of Guerra* to the extent that noncitizen detainees no longer bear the burden of proving that they merit release at their bond hearings; now, the burden has shifted to the Government to prove that release is *not* merited." *Garcia*, 817 F. Supp. 3d at 127 (citing *Hernandez-Lara*, 10 F.4th at 41).  However, *Matter of Guerra* is still treated as helpful "guidance" as to how IJs are to evaluate dangerousness and flight risk in the context of bond determinations. *See Miti*, 2026 WL 884639, at *6 n.15.

provided by Mr. De Souza's girlfriend at the time of the arrest in which she described Mr. De Souza's behavior toward her. *Id.*

Mr. De Souza brings up two issues with the IJ's approach. First, he appears to argue that, because the criminal charge against him was dismissed, the IJ no longer has any basis for keeping him detained. *See* ECF No. 10 at 1. Second, Mr. De Souza asserts that it was legal error for the IJ to make her dangerousness determination based on a purportedly "uncorroborated police report." ECF No. 9 at 10-15. The Court finds no legal error in either approach.

The Court begins with Mr. De Souza's first argument. Though his domestic assault and battery charge was pending at the time of his bond proceeding, Mr. De Souza recently told the Court that this charge has been dismissed for failure to prosecute. *See* ECF No. 10 at 4 (displaying docket for *Commonwealth v. Soares De Souza* and providing, as of May 6, 2026, that the "Court orders all charges to be dismissed forthwith, upon Failure to prosecute").

However, "[t]he mere fact that the assault [and battery] charge against [Mr. De Souza] was dismissed does not automatically cancel out its evidentiary value." *Miti*, 2026 WL 884639, at *6. Indeed, the BIA has expressly stated that IJs "are not limited to considering *only* criminal convictions in assessing whether [a noncitizen] is a danger to the community." *Matter of Guerra*, 24 I&N Dec. at 40 (emphasis in original). The IJ is permitted to consider "[a]ny evidence in the record that is probative and specific," including "evidence of criminal activity." *Id.* at 41; *see also* 8 C.F.R. § 1003.19(d) ("The determination of the [IJ] as to custody status or bond may

11

be based upon any information that is available to the Immigration Judge or that is presented to him or her by the [noncitizen] or [DHS].").  Accordingly, the IJ did not err in considering the fact that Mr. De Souza was charged with and arrested for domestic assault and battery, even if that charge has since been dismissed.

Relatedly, as to his second argument, the Court also finds no legal error in the IJ's reliance on the police report detailing Mr. DeSouza's arrest.  As this Court has said before, "[i]t is permissible . . . for an IJ to rely on a police report—even if it does not result in a criminal conviction—so long as the allegations contained therein are supported by corroborating evidence."  *Higiro*, 2026 WL 1329522, at *6 (internal citations omitted).  In this regard, the First Circuit's recent decision in *Rosa v. Garland*, 114 F.4th 1 (1st Cir. 2024), is informative.  There, the court held that, when an IJ exercises discretion in the weighing of positive or negative factors, "the [IJ] may not give 'substantial weight' to a police report in the absence of 'a conviction or corroborating evidence of the allegations contained' in the report."  *Rosa*, 114 F.4th at 17 (quoting *In re Arreguin de Rodriguez*, 21 I&N Dec. 38, 42 (BIA 1995)).[10]

*Rosa* was followed by another First Circuit opinion, *Maurice v. Bondi*, 154 F.4th 15 (1st Cir. 2025).  In that case, the First Circuit reiterated *Rosa*'s holding and

---

[10] To be sure, the First Circuit made this decision in the context of an IJ's denial of an immigrant's application for adjustment of status based on the IJ assigning great weight to the immigrant's arrest report as a factor weighing against granting relief. *See Rosa*, 114 F.4th at 16.  However, given that an IJ is also given broad discretion in deciding how much weight to assign certain factors in a bond determination proceeding, *see Matter of Guerra*, 24 I&N Dec. at 40; *see also* 8 C.F.R. § 1003.19(d), the Court finds that the IJ's discretion in bond determinations is also cabined by the First Circuit's decision in *Rosa*.

held that the BIA erred by failing to consider whether police reports in the record were corroborated before assigning those reports substantial weight. *See Maurice*, 154 F.4th at 22 (citing *Rosa*, 114 F.4th at 21-22 (citing *In re Arreguin*, 21 I&N Dec. at 42)).[11]

After the First Circuit's decisions in *Rosa* and *Maurice*, this Court has now held on several occasions that "an uncorroborated police report cannot, by itself, establish dangerousness as a matter of law." *Higiro*, 2026 WL 1329522, at *6; *see also Picado*, 2026 WL 352691, at *7 ("Without more, an uncorroborated police report is simply not clear and convincing evidence sufficient for a finding of dangerousness."); *Rosa Pineda v. Nessinger*, No. 25-cv-522-MSM-AEM, 2025 WL 3267328, at *1 (D.R.I. Nov. 24, 2025) ("[A]n uncorroborated police report cannot, alone, be 'clear and convincing evidence sufficient for a finding of dangerousness.'"); *Alvarez Puerta v. Nessinger*, No. 25-cv-108-JJM-AEM, slip op. at 1 (D.R.I. June 17, 2025) (finding that an uncorroborated police report was not clear and convincing evidence sufficient for a finding of dangerousness); *cf. España*, 2026 WL 821788, at *11-13 (finding an I-213 Form to be "nothing more than a police report created by a DHS officer" and concluding that it was legally erroneous for an IJ to have relied on it given its multiple inconsistencies and its lack of corroborating evidence).

---

[11] Again, this case involved an IJ's denial of an immigrant's application for adjustment of status. *See Maurice*, 154 F.4th at 22.

That said, the IJ in Mr. De Souza's case relied on more than just those allegations made by police officers in their police report. *Cf. Matter of D. Rodriguez*, 28 I&N Dec. 815, 824 (BIA 2024) ("The arrest report in *Matter of Arreguin*, 21 I&N Dec. at 42, was based on uncorroborated statements of law enforcement officers and the allegations in those reports did not result in a conviction."). The IJ found the report to be sufficiently corroborated by a statement provided to the police by Mr. De Souza's girlfriend at the time of his arrest in which she described Mr. De Souza's behavior toward her. *See* Bond Hearing, at 15:23-15:35. The girlfriend's statement, as recounted by the IJ, described how Mr. De Souza forcibly grabbed her by her left ear and tore her AirPod out, causing the piercing in her ear to bleed, and observed how Mr. De Souza would "strike the walls, doors or other inanimate objects" during drunken stupors. *Id.* at 13:52-14:14. The IJ also relied on the portion of the statement in which the girlfriend described Mr. De Souza's behavior as "violent and argumentative," and that she "was and still is scared of [Mr. De Souza], and that it is shameful to report such matters." *Id.* at 14:25-14:38.

To be sure, the IJ acknowledged that Mr. De Souza's girlfriend had essentially recanted[12] her prior statement to police in a letter she wrote to the IJ. ECF No. 5-4 at 2. In that letter, the girlfriend stated that: "[Mr. De Souza] did not physically harm [her]"; "[she] did not sustain any injuries"; and "[a]t no point did [she] feel that [she] was in danger." *Id.* However, the IJ ultimately decided that she would be "giving

---

[12] Recanting refers to the act of "withdraw[ing] or renounc[ing] (prior statements or testimony) formally or publicly." *Recant*, Black's Law Dictionary (9th ed. 2009).

more weight to the statement of the alleged victim during the contemporaneous interview with the officers, than a recantation letter much after the fact, when she would likely have more time to consider these things." Bond Hearing, at 14:39-15:02. The IJ explained that she was "giving more weight to the statement [Mr. De Souza's girlfriend] made at the time, and around the time of the incident, as it was made in real time." *Id.* at 15:04-15:15.

Mr. De Souza essentially claims that the arrest report was not sufficiently corroborated by the record and that it was legal error for the IJ to have assigned more weight to his girlfriend's contemporaneous statement to the police than her subsequent recantation of that statement.[13]   *See* ECF No. 9 at 9-10.   The Court disagrees.

Corroborating evidence, as the BIA has come to define it post-*Rosa*, can include statements made by the alleged victim of a crime that the noncitizen is accused of having committed, as well as statements made by the noncitizen themselves.  *See Matter of D. Rodriguez*, 28 I&N Dec. at 824 (explaining that a police report was sufficiently corroborated because it collected "statements that the victim made to her therapist, her mother, and a forensic interviewer, as well as statements allegedly made by the respondent himself to the victim's mother").  As such, the IJ was correct

---

[13] Mr. De Souza also argues that the police report is inherently unreliable because the officers used his girlfriend's son to interpret the conversation between them.  ECF No. 9 at 14-15.  However, in making her ultimate bond determination, the IJ did not rely on Mr. De Souza's interpreted statement to the police.  Rather, she relied on the statements that Mr. De Souza's girlfriend made, and nothing in the record shows that she had any problem communicating with the police in English.

in noting that "there is corroboration within the police report given the statements of the alleged victim herself, that in itself is corroboration of the police report and the violence to the [alleged] victim." Bond Hearing, at 15:23-15:35.

And generally speaking, under the Federal Rules of Evidence, courts tend to find contemporaneous statements to be reliable because declarants are unlikely to have time to develop the intent to fabricate those statements.[14] *See* Fed. R. Evid. 803 advisory committee's note to Paragraphs (1) and (2) ("[S]ubstantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation."). Though "immigration proceedings are not governed by the rules of evidence," *Andrade-Prado v. Garland*, 64 F.4th 386, 394 (1st Cir. 2023), IJs still remain free to apply those rules as guidance in their proceedings. *See Matter of M-A-M-Z-*, 28 I&N Dec. 173, 177 (BIA 2020) (observing that, even though "[t]he Federal Rules of Evidence are not binding in immigration proceedings," they can still "provide[ ] a useful guidepost for [IJs] in making factual findings").

Here too then, the Court cannot conclude that the IJ committed legal error by placing more weight on Mr. De Souza's girlfriend's contemporaneous statement to the police as opposed to her subsequent recantation of that statement. That the

---

[14] This principle is especially true when evaluating the recantations of alleged victims in domestic violence cases. *See* Carol A. Chase, *Is* Crawford *a "Get Out of Jail Free" Card for Batterers and Abusers? An Argument for a Narrow Definition of "Testimonial,"* 84 Or. L. Rev. 1093, 1106 (2005); Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of* Crawford v. Washington *on Domestic Violence and Rape Prosecutions*, 37 B.C. J.L. & Soc. Just. 1, 13 n.72 (2017).

16

recantation occurred does not cancel out the corroborative effect of the earlier statement.

In any event, even if the Court were to disagree with how the IJ weighed the evidence before her, this is of no consequence because "[t]he Court . . . 'has no authority to encroach upon an IJ's discretionary weighing of the evidence.'" *Garcia*, 817 F. Supp. 3d at 126 (quoting *Diaz-Calderon v. Barr*, 535 F. Supp. 3d 669, 676 (E.D. Mich. 2020)); *see also Arellano v. Sessions*, No. 6:18-cv-06625-MAT, 2019 WL 3387210, at *7 (W.D.N.Y. July 26, 2019)). As the First Circuit instructs, the Court must be "mindful of [its] obligation to afford . . . a degree of deference to the [factfinder's] determinations." *United States v. Tortora*, 922 F.2d 880, 882 (1st Cir. 1990). Absent any legal or constitutional error in the IJ's analysis, the Court must let the IJ's decision stand.

There were no such errors here. Based on the totality of the evidence before the IJ, a reasonable jurist could have concluded by clear and convincing evidence that Mr. De Souza posed a danger to the community.

## III.    CONCLUSION

For the reasons stated above, the Court DENIES Mr. De Souza's petition. ECF No. 1.

17

IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court


June 4, 2026

18